IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK E. SINGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11-cv-02679 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| PROGRESSIVE CARE, SC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Mark Singer filed this *qui tam* action pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, against Dr. Mark Karides, Dr. Irfan Mirza, and Dr. Bozena Witek (collectively, "Individual Defendants"), as well as Progressive Care, SC ("Progressive," and together with the Individual Defendants, "Defendants"). Singer used to serve as the Chief Operating Officer for Progressive, an oncology and hematology medical practice where the Individual Defendants were physicians and shareholders. Singer claims that Defendants violated the FCA by conspiring to submit fraudulent bills to Medicare and then discharged him in retaliation for his complaints about their unlawful billing practices. Defendants have filed a motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the public-disclosure rule acts as a jurisdictional bar to Singer's FCA claims, and pursuant Federal Rule of Civil Procedure 12(b)(6), arguing that Singer has failed to state a claim for relief with respect to any of his causes of action. Defendants also contend that Singer's claims are judicially and equitably estopped due to certain statements he or his representatives made in earlier litigation.

For the reasons explained below, while the Court declines to find that Singer's FCA claims are barred by the public-disclosure rule or that he should be equitably or judicially estopped from bringing his claims, the Court nonetheless must dismiss Singer's FCA claims pursuant to Rule 12(b)(6) for failure to state a claim. Having dismissed all of the claims over which this Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Singer's state law retaliation claim.

## BACKGROUND

According to Singer, between 2007 and 2009, Defendants engaged in a number of schemes to defraud the United States government through practices that violated Medicaid and Medicare program guidelines.

Singer first alleges that Defendants illegally referred patients in need of positron emission tomography ("PET") scans to an off-site location in which Defendants themselves had a financial interest, the Northwest Regional Cancer Treatment Center ("Northwest"), in violation of the Stark Law, 42 U.S.C. § 1395 *et seq*. (Am. Compl. ¶ 46, Dkt. No. 14.) The Stark Law prohibits physician "self-referral"—*i.e.*, the practice of a physician referring a patient to a separate medical facility in which the physician has a financial interest—unless certain conditions have been met. (*Id.* ¶¶ 31–32, 34.) Under the Stark Law and its related regulations, in order to make referrals to Northwest, Defendants were required (i) to maintain a fully-staffed and operational medical office at Northwest that actually operated at least six of the eight leased hours per day; (ii) to ensure that a physician was actually physically present and seeing non-scheduled PET patients at Northwest at least six hours of each leased day; and (iii) to ensure that a physician was physically present for each and every PET scan performed on Defendants' patients at Northwest. (*Id.* ¶ 49.) Singer alleges that Defendants were aware of these regulations

yet consciously disregarded them. (*Id.* ¶¶ 50, 54, 61.) He further contends that Defendants had their patients undergo approximately eight or more PET scans each and every week at Northwest, with approximately 72% of those tests being submitted for payment by Medicare. (*Id.* ¶¶ 64–65.)

Singer next alleges that Defendants engaged in FCA violations with respect to their administration of the drug Procrit to patients. Procrit is prescribed for cancer patients. (*Id.* ¶ 71.) Due to Procrit's risk of causing serious health problems, the Federal Drug Administration ("FDA") has regulated its use: Procrit may only be used to treat a limited number of conditions, such as chemotherapy-induced anemia, and even then only after blood tests have been performed to determine the suitability of Procrit for the particular patient's care. (*Id.* ¶ 75.) FDA regulations also require the use of Procrit to be terminated immediately when the patient completes the recommended dosage for the particular medical condition for which it was specifically prescribed. (*Id.*) Patients receiving Procrit must be examined and tested by a physician before the drug is administered, and doctors are required to administer additional blood-testing before each dose given to the patient. (*Id.*) According to Singer, Defendants knew about these regulations as well but intentionally disregarded them. (*Id.* ¶ 76.) Specifically, Singer claims that Defendants would administer Procrit to their patients before undertaking the FDA-mandated, pre-use testing, and would then perform blood-testing after the fact so that patient records would falsely reflect compliance with FDA regulations. (*Id.* ¶ 82.) Singer further alleges that Defendants prescribed and administered Procrit to approximately 60 to 80 patients each and every month, and submitted false claims for payment by Medicare for approximately 72% of all of those patients. (*Id.* ¶ 92.)

Notably, although Singer claims that approximately 72% of Defendants' bills were submitted for payment by Medicare, he does not plead any specific examples of the allegedly

3

fraudulent practices regarding PET scans and Procrit injections. He instead asserts that all billing records that would identify the fraudulent submissions are in the exclusive control of Defendants. (*Id.* ¶¶ 68, 94–95.)

Finally, Singer alleges that Defendants billed for alleged consultations in time increments much higher than the time actually spent with individual patients. (*Id*. ¶¶ 103–04.)

In addition to his allegations of fraud in connection with Defendants' practices regarding PET scans, Procrit injections, and billing, Singer asserts that Defendants retaliated against him after he informed them that their actions were illegal and unsafe. (*Id.* ¶¶ 100, 104.). He claims that he warned Defendants "that he would pursue [them] by way of a whistleblower action" and that they were "going to be rocked by the feds," and that he ultimately sought another employee's assistance in bringing an FCA action. (*Id.* ¶¶ 128–29.) According to Singer, he was subsequently terminated in retaliation for these internal complaints. (*Id.* ¶ 120.)

Based on this alleged misconduct, Singer asserts claims against Defendants under the provisions of the FCA prohibiting any person from (i) knowingly presenting, or causing to be presented, a false claim or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A) (Count I); (ii) knowingly making, using or causing to be made or used, a false record or or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B) (Count II); and (iii) conspiring to commit the aforementioned violations, 31 U.S.C. § 3729(a)(1)(C) (Count III). In addition, he asserts claims for retaliation under both the FCA, 31 U.S.C. § 3730(h)(1) (Count IV), and Illinois common law (Count V).

## DISCUSSION

Defendants have moved to dismiss the Amended Complaint on several grounds. First, they argue that Singer's FCA claims regarding the alleged Starks Law violations are barred by

4

the FCA's public-disclosure rule. Second, Defendants seek to have all of Singer's claims dismissed as insufficiently pleaded pursuant to Rule 12(b)(6). Finally, Defendants argue that Singer's claims are barred by the doctrines of equitable estoppel and judicial estoppel. The Court addresses each of these arguments in turn.

**I.      The FCA's Public-Disclosure Bar**

To combat fraud, the FCA imposes civil liability on any party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the government. 31 U.S.C. §§ 3729(a)(1)(A)–(B). The FCA provides for a *qui tam* enforcement mechanism, which allows a private party (also known as a "relator") to bring a lawsuit on behalf of the government to recover money that the government paid as a result of fraudulent claims. *See* 31 U.S.C. § 3730(b). To encourage private citizens to come forward with knowledge of fraudulent activity, the FCA entitles prevailing relators to receive a share of the funds they recover. *See* 31 U.S.C. §§ 3730(d)(1)–(2). A *qui tam* action would serve no purpose, however, if "the government is already aware that it might have been defrauded and can take responsive action." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009). Accordingly, a *qui tam* suit is barred when the allegations in the complaint are based on information that is already known to the government. This "public-disclosure" bar provides that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4).[1]

---

[1] Section 3730(e)(4) was amended on March 23, 2010. But the amendment was not retroactive and the version that applies in this case is that which was "in force when the events underlying this suit took place." *U.S. ex rel. Goldberg v. Rush Univ. Med Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012). Because the

Defendants in this case argue that the public-disclosure bar precludes the Court from considering Singer's PET scan claims.[2] According to Defendants, Singer's claims are parasitic of a previous lawsuit filed by Adrian Bianco, a former Progressive shareholder, in Cook County Chancery Court ("*Bianco* Suit"). Bianco sued Progressive, the Individual Defendants, and Singer for a number of causes of action sounding in the laws of contract and fiduciary duty, but he did not assert an FCA claim. The relevant portions of the complaint in the *Bianco* Suit alleged that Progressive failed to comply with Stark Law requirements for referrals of patients for PET scans at Northwest. (*See Bianco* Compl. ¶¶ 75, 82, Dkt. No. 42-1.) Bianco filed his lawsuit in January 2010, over one year before Singer filed the instant suit.

This Court must conduct a three-step inquiry to determine whether a *qui tam* suit is precluded by the public-disclosure bar. First, the Court must examine whether the relator's allegations have been "publicly disclosed." *Glaser*, 570 F.3d at 913. If so, the Court next must ask whether the lawsuit is "based upon" those publicly-disclosed allegations. *Id.* If it is, the Court must determine whether the relator is an "original source" of the information upon which his lawsuit is based. *Id.* At each stage of the analysis, the plaintiff bears the burden of proof. *Id.* (citing 31 U.S.C. § 3731(c)).

The first inquiry is readily answered in the affirmative: Singer's allegations regarding Progressive's fraudulent PET scan practices clearly were publicly disclosed before Singer filed this lawsuit. Public disclosure occurs when the critical elements exposing a transaction as allegedly fraudulent are placed in the public domain, including by the filing of a state court complaint. *See U.S. ex rel. Pishghadamian v. Nicor Gas*, No. 09-cv-298, 2013 WL 1787817, at

---

Amended Complaint alleges that Defendants engaged in PET scan fraud between January 2007 and April 30, 2009, the pre-Mach 23, 2010 version of the statute applies.

[2] Defendants do not challenge Singer's FCA claims regarding Procrit injections or excessive billing on this ground.

*2 (N.D. Ill. April 25, 2013) (citing *Glaser*, 570 F.3d at 913). This is true whether or not the previous lawsuit proceeded on the same cause of action. *Id.*

Here, the same critical elements alleged by Singer with respect to the PET scans were also alleged in the *Bianco* Suit. Both complaints allege that Defendants had a lease arrangement with Northwest to use the PET scanner and referred patients to Northwest for PET scans. (*Bianco* Compl. ¶¶ 18-20, Dkt. No. 42-1; Am. Compl. ¶¶ 46-47, Dkt. No. 14.) Both allege that the Stark Law and its associated regulations required Defendants to have and use an office at Northwest for purposes unrelated to the PET scanner, to staff that office with a Progressive doctor for services unrelated to the PET scanner, and to have a doctor present for every PET scan. (*Bianco* Compl. ¶¶ 19, 32, Dkt. No. 42-1; Am. Compl. ¶¶ 45, 49-51, Dkt. No. 14.) Both allege that Defendants engaged in fraud by knowingly violating those requirements and by creating false paperwork to cover up their infractions. (*Bianco* Compl. ¶¶ 18-33, 75-77, 82-84, Dkt. No. 42-1; Am. Compl. ¶¶ 45-61, Dkt. No. 14.) Finally, both allege that Defendants submitted fraudulent claims to Medicare relating to PET scans performed at Northwest. (*Bianco* Compl. ¶¶ 18-33, 75-77, 82-84; Am. Compl. ¶¶ 45-67, 107, 112). Because Singer's lawsuit and the *Bianco* Suit describe the same violations of the same statute by the same conduct, it is clear that the facts upon which Singer bases his PET scan claim were publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4).

It is likewise clear that Singer's PET-scan allegations are "based upon" the publicly-disclosed allegations in the *Bianco* Suit. A relator's complaint is considered to be based upon publicly-disclosed allegations when the relator's allegations are "substantially similar" to allegations that have already been placed in the public domain, regardless whether the relator derived his allegations independently of the previously disclosed allegations. *Glaser*, 570 F.3d at

7

919-20. It also does not matter if the relator's allegations are only partly based upon publicly-disclosed allegations. *Id.* at 921 (citing *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992)). As Singer's allegations regarding the PET scans are essentially identical to those alleged in the *Bianco* Suit, this second requirement of 31 U.S.C. § 3730(e)(4) has been met.

The third prerequisite for the public-disclosure bar has not been met, however, as Singer is an "original source" of the allegations regarding the PET scans. To be an original source, a relator must have "direct" and "independent" knowledge of fraudulent activity. *Glaser*, 570 F.3d at 917. Direct knowledge of fraudulent conduct is based on one's "own investigative efforts and not derived from the knowledge of others." *Id.* at 917. To establish independent knowledge of fraudulent conduct, a relator must be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Id.* at 921.

Although Singer only conclusorily pleads in his Amended Complaint that he "is the original source of the allegations and transactions alleged in this Complaint" (*see* Am. Compl. ¶¶ 8, 20, Dkt. No. 14), he was Progressive's Chief Operational Officer and certainly was in a position to learn about the allegedly fraudulent billing practices through his own efforts. (*See id.* ¶ 119.) Furthermore, Singer attached to his brief in response to Defendants' motion to dismiss an affidavit stating that he derived the information regarding the PET scans independently of the *Bianco* Suit, and furthermore that he originally identified the potential regulatory issues posed by the illegal PET-scan scheme in 2007, prior to the *Bianco* Suit. (Singer Aff. ¶¶ 2-13, Dkt. No. 48 Ex. 1.) Between the allegations in the Amended Complaint regarding the key role Singer played at Progressive as its Chief Operational Officer and the representations in his affidavit, Singer has

done enough to be considered an original source at this stage of the litigation.[3] *See Bannon v. Edgewater Med. Ctr.*, 406 F. Supp. 2d 907, 919-20 (N.D. Ill. 2005) (noting that a court may take into account an affidavit submitted by a relator in assessing whether the FCA's public-disclosure bar applies).

In an attempt to overcome Singer's original-source arguments, Defendants cite sworn deposition testimony and interrogatory responses from Singer in connection with prior lawsuits that they claim refute Singer's argument that he is an original source of the allegations in this case. The Court finds these arguments unpersuasive, however, as all of Defendants' evidence is taken out of context from unrelated lawsuits and refers to time periods before the allegedly fraudulent conduct began.

For example, Defendants cite Singer's testimony during a 2008 deposition in an unrelated lawsuit that, "Progressive did not commit Medicare fraud." (Mot. to Dismiss Ex. D at 52:23, Dkt. No. 42-4.) In context, however, it is clear that Singer was testifying about Progressive's conduct in 2004, whereas the allegations in the Amended Complaint pertain to Progressive's activities in 2007 and later. (*See id.* at 51:12-53:10.) Similarly, Defendants cite interrogatory responses verified by Singer (again, submitted in an unrelated lawsuit) stating that, "Progressive Care utilizes and complies with all Medicare and Medicaid program requirements and guidelines." (Mot. to Dismiss Ex. C at 7, Dkt. No. 42-3.) But those interrogatory responses are dated January 22, 2007. (*See id.* at 18.) In this case, Singer alleges that the misconduct regarding

---

[3] Defendants strenuously object to the Court's consideration of Singer's affidavit, arguing that the relevant portions are inadmissible. And the Court agrees that not all of Singer's affidavit is admissible. But the portions of the affidavit establishing Singer as an original source are based upon his personal knowledge, set out facts that would be admissible in evidence, and show that Singer is competent to testify on those matters. (*See* Singer Aff. ¶ 11 (stating that allegations in Amended Complaint are based on Singer's "first-hand, direct, and independent investigation of Defendants' fraudulent and false claims to Medicare for PET scans"); ¶¶ 8-9 (stating that in early 2007, Singer identified the PET scan behaviors that later became the subject of the instant lawsuit and the *Bianco* suit), Dkt. No. 48.)

9

PET scans began in January 2007, and presumably it took Singer some time to discern the impropriety of the behavior. Thus, the old, January 2007 interrogatory responses are irrelevant to the issue of whether the public-disclosure bar applies. Finally, Defendants cite a mediation submission in the *Bianco* suit in which an attorney representing Singer and the Individual Defendants stated, with respect to Bianco's PET scan claims, that Bianco was "wrong on both the facts and the law." (Mot. to Dismiss Ex. E at 3, Dkt. No. 42-5.) However, the Court sees nothing in that exhibit that refutes Singer's assertion that he was an original source of the PET scan claims in the instant litigation. The other evidence marshalled by Defendants is similarly flawed and irrelevant to the public-disclosure bar.

Accordingly, the Court finds that there is no bar to its consideration of the PET scan claims asserted in Singer's Amended Complaint.

## II. Motion to Dismiss for Failure to State a Claim

Defendants have also moved to dismiss all of Singer's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering such a motion, the Court must view the complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

For plaintiffs alleging fraud, Federal Rule of Civil Procedure Rule 9(b) imposes the additional requirement that the circumstances constituting the fraud be pleaded "with particularity." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB*, 649 F.3d at 615 (citing *Pirelli Armstrong Tire*

10

*Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011)). In other words, Rule 9(b) requires a plaintiff pleading fraud "to state 'the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Uni \*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)).

### A.     Counts I and II – FCA Fraud Claims

Claims under the FCA sound in fraud and thus must be pleaded with particularity under Rule 9(b). *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). In the FCA context, the particularity requirement means that a relator must plead at least some actual examples of false claims. *See, e.g., U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730 (7th Cir. 2007), *overruled on other grounds by Glaser*, 570 F.3d 907. As currently pleaded, the Amended Complaint fails to state a claim with respect to Singer's FCA claims under 31 U.S.C. §§ 3729 (a)(l)(A) and (a)(l)(B).

The Seventh Circuit's decision in *Fowler* is instructive. In that case, the relators alleged that the defendants had engaged in a scheme to bill for prescriptions that were later returned. *Id.* at 741. The Seventh Circuit affirmed the district court's dismissal of the claims because the relators did not present any allegations "***at an individualized transaction level*** to demonstrate that [the defendant] failed to provide an appropriate refund or replacement product for a returned prescription." *Id.* at 741-42 (emphasis in original). Since *Fowler*, numerous district courts have applied this standard and dismissed FCA claims where the relator failed to allege instances of fraud at the individual transactional level. *See, e.g., U.S. ex rel. Soulias v. N.W. Univ.*, No. 10 C 7233, 2013 WL 3275839, at *3 (N.D. Ill. June 27, 2013) (collecting cases). That is true even

11

when, as here, a relator alleges that a defendant has engaged in a scheme involving numerous fraudulent transactions over a period of years. Singer "need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples." *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010). He has not done so. Singer has failed to identify the date, amount, content, or payment for any single false claim. Accordingly, he has not stated his claims with sufficient particularity under Rule 9(b).

In defense of his Amended Complaint, Singer argues that there is no requirement under the FCA to engage in transaction-specific pleading. He also contends that because Defendants have exclusive control of the relevant billing records, the heightened pleading requirements under Rule 9(b) should be relaxed.[4] Singer cites a number of cases for the proposition that Rule 9(b) need not be applied rigidly when information is outside the control of the plaintiff. But all of the FCA-specific cases to which he cites involve much more detailed pleading than what Singer has done here. For example, Singer cites *Goldberg v. Rush University Medical Center*, 929 F. Supp. 2d 807 (N.D. Ill. 2013), for the proposition that, "Rule 9(b) does not act as a rigid bar to filing a charge of fraud for individuals with less than perfect knowledge." *Id.* at 818. But that case, in finding that FCA allegations met the requirements of Rule 9(b), noted that the relators there described in detail several surgeries for which Medicare was allegedly billed in violation of the FCA. *Id.* at 812-13. So it would appear that the *Goldberg* plaintiff *did* plead representative examples of FCA violations on an individual-transaction basis.

Singer also cites one outlier case that exempted a plaintiff from the "typical" necessity that a relator "[link] the allegations of fraud to an actual false claim for payment." *U.S. ex rel.*

---

[4] Singer's argument is undercut by his own allegation in the Amended Complaint that he "has in his possession and control, and previously provided to the Government in connection with his Disclosures, the data/list of all patients who were subjected to DEFENDANTS' fraudulent Procrit scheme." (Am. Compl. ¶ 88, Dkt. No. 14.)

12

*Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007). In *Kennedy*, the relators were former sales representatives for the defendant who described the defendant's scheme to market one of its drug's off-label uses, which resulted in doctors submitting fraudulent reimbursement claims to the government. *Id.* at 1161. Although the relators failed to tie the alleged scheme to the submission of particular fraudulent claims, the district court nonetheless found that they had pleaded their claims with sufficient particularity under Rule 9(b):

> [The] relators have alleged with particularity facts regarding defendants' alleged off-label marketing. Specific facts, however, regarding particular claims were and are not likely within relators' reach. Given the significant proportion of medical care in this country that is financed by Medicare and Medicaid, relators have drawn a reasonable inference that claims for reimbursement regarding off-label uses of Lovenox were submitted to the federal government or the State of Illinois for payment. For these reasons, dismissal at this stage under Rule 9(b) would be inappropriate.

*Id.* at 1167.

But *Kennedy* is readily distinguished from the present case based on Singer's role at Progressive. Singer served as Progressive's Chief Operational Officer during the time period when the allegedly fraudulent activities took place. Thus, Singer would have had—at least at one time—access to records documenting specific fraudulent transactions. On the other hand, the relators in *Kennedy* never had access to materials that documented the fraud they alleged. *Cf. U.S. ex rel. Bragg v. SCR Med. Transp., Inc.*, No. 07-cv-2328, 2011 WL 1357490, at *4 (N.D. Ill. Apr. 8, 2011) (distinguishing *Kennedy* based on the fact that the relators in *Kennedy* had no access to materials proving fraud, while noting that the relator then before the court "had daily access" to materials documenting the allegedly fraudulent transactions). Singer, in contrast, did not want for access to specific information that would allow him to link the fraudulent scheme he alleges to specific instances of billing to the government. *See id.*; *U.S. ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 898 n.5 (N.D. Ill. 2009) (noting that courts

13

in this District that have relaxed Rule 9(b)'s pleading standard typically do so when the plaintiff is alleging a wider fraudulent scheme in which he or she had no role).

The Court declines to follow Singer's suggestion and find that the Amended Complaint states a claim under § 3729(a)(l)(A) and § 3729(a)(l)(B) based on the allegation that approximately 72% of Defendants' bills were submitted for payment by Medicare. Singer's argument seems to be that the Court should accept that he has sufficiently pleaded FCA claims because he has alleged that Defendants engaged in endemic violations of federal regulations and that a large proportion of Defendants' billing was submitted to the government in the form of Medicare claims.

But the Seventh Circuit rejected such probability-based FCA pleading in *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006). There, a former pharmacy employee alleged that the pharmacy improperly recycled medication, which originally had been paid for by Medicaid for use by nursing home patients and returned to the pharmacy by the nursing homes, by reselling it for use by other Medicaid patients. *Id.* at 854-55. The relator was unable to tie any particular recycled medication to any specific Medicaid claim. *Id.* at 856. Instead, she relied on the probability that the 10% to 20% of the medication returned from nursing homes was distributed to some of the 60% of nursing home patients on Medicaid. *Id.* The Seventh Circuit found these allegations insufficient, holding that a relator must point to at least a single false claim that was actually submitted, not just probably submitted. *Id.* Since the relator in *Crews* was unable to do that, the Seventh Circuit affirmed the district court's dismissal of her claim. *Id.* at 857. Similarly, Singer's allegation that approximately 72% of Defendants' bills were submitted for payment by Medicare—without identification of a single, individual bill that actually was submitted—is insufficient to establish a claim under the FCA.

Counts I and II of Singer's Amended Complaint are therefore dismissed for failure to state a claim.

B.     **Count III - FCA Conspiracy Claim**

The FCA also imposes liability on persons who "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). The Seventh Circuit has held that "general civil conspiracy principles apply" to FCA conspiracy claims. *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999) (citing *U.S. v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)). To state a claim under § 3729(a)(3), a plaintiff must allege two elements: (1) that the conspirators had an agreement, combination, or conspiracy to defraud the government by getting a false or fraudulent claim allowed or paid; and (2) that the conspirators did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government. *See Walner*, 660 F. Supp. 2d at 895-96. In this case, Singer alleges that Defendants conspired to commit fraud against the United States in order to get false claims paid. Because he alleges a conspiracy premised upon fraudulent conduct, the conspiracy charge must be pleaded with the same specificity as a fraud claim. *See, e.g., Goldberg*, 929 F. Supp. 2d at 825. That is, he must allege the "who, what, when, where, and how" of the conspiracy to defraud the government. *Walner*, 660 F. Supp. 2d at 897-98.

As noted above, Singer's pleading of the underlying FCA claims is fatally deficient. That would be enough to doom his conspiracy claim as well. But Singer also fails to plead each Defendant's role in the conspiracy sufficiently. He lumps all Defendants into a single act of conspiracy, rather than describing each Defendant's role, including identifying who submitted the false claims. Accordingly, Singer has failed to allege his fraud conspiracy with the particularity required by Rule 9(b) and Count III must be dismissed.

15

### C. Count VI - FCA Retaliation Claim

Singer also claims that he was discharged in violation of the FCA's protections against retaliation in employment, which provide that "[a]ny employee who is discharged . . . because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section . . . shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). To survive a motion to dismiss, a complaint alleging an FCA retaliation claim must contain factual allegations that, if proven, would establish that (1) the plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA, (2) the employer knew the plaintiff was engaged in protected conduct, and (3) the employer was motivated to take an adverse employment action against the plaintiff because of the protected conduct. *See Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004) (citing *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002)).

Because Singer has failed to state a claim with respect to his claims under § 3729(a)(l)(A) and § 3729(a)(l)(B), his FCA retaliation claim fails as well. *See McGinnis*, 2014 WL 378644 at *8 ("Without finding that the Plaintiff has sufficiently pled the claims for reimbursement were fraudulent or ever presented to the government, the Court cannot conclude that the allegations support a finding that Plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA."). Thus, the Court dismisses Count IV of the Amended Complaint.

### D. Count IV - Common Law Retaliation

Because the Court has dismissed all of Singer's FCA claims, which are the only claims over which the Court has original jurisdiction, it must now address whether to retain jurisdiction over Singer's Illinois common law retaliation claim. *See* 28 U.S.C. § 1367(c)(3). "It is the well-

established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999). *See also Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Although the Seventh Circuit has noted occasional circumstances when a federal court should retain jurisdiction over pendent state law claims despite the dismissal of all federal claims, the instant case does not appear to be one of those "unusual cases." *See Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994). This is not a situation, for example, "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. Illinois law gives Singer one year from dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. *See* 735 ILCS 5/13–217; *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice is also appropriate here because substantial judicial resources have not been committed to Singer's state law claim. *Wright*, 29 F.3d at 1251. Finally, because resolution of Singer's state law claim would require the Court to determine whether Singer was discharged because of his internal complaints regarding Defendants' allegedly fraudulent activities, this is not a circumstance in which "it is absolutely clear how the pendent claim[] can be decided." *Id.* Accordingly, the Court dismisses Singer's Illinois common law retaliation claim without prejudice.

## III.  Estoppel Arguments

Because Singer's claims are being dismissed without prejudice and he may elect to re-plead them, the Court will proceed to discuss Defendants' alternative arguments that Singer's claims are barred by the doctrines of equitable estoppel and judicial estoppel. In support of these arguments, Defendants first cite the deposition testimony and interrogatory responses discussed

above. For the reasons already discussed, the Court finds that evidence to be irrelevant, as it came from unrelated lawsuits and refers to time periods prior to when the alleged FCA violations took place. More importantly, however, Defendants cite a mediation statement submitted on Singer's (and the Individual Defendants') behalf in the *Bianco* Suit that addresses the same activities Singer now characterizes as FCA violations. The relevant portion of the mediation brief states:

> In Counts One and Two, Bianco claims that Progressive illegally performed PET scans (a procedure similar to a CT scan) at Northwest Regional Cancer Treatment Center in Des Plaines, Illinois. According to Bianco, under federal regulations, a physician was required to be physically present during a patient's PET scan. Bianco claims that the individual Defendants were not present during the PET scans and created documentation to make it appear that they were present during the scans.
>
> Bianco is wrong on both the facts and the law. The law does not require physicians to be present during PET scans to seek reimbursement for the tests. Moreover, no documents ever were falsified to make it appear that doctors were present for the tests.

(Mot. to Dismiss Ex. E at 11-12, Dkt. No. 42-5.)

### A. Equitable Estoppel

Equitable estoppel is based on principles of fairness and used to prevent a party from being harmed as a result of actions taken in reasonable reliance on another's assertions. *See Jackson v. Rockford Hous. Auth.*, 213 F.3d 389, 394 (7th Cir. 2000). A party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) a detriment. *LaBonte v. U.S.*, 233 F.3d 1049, 1053 (7th Cir. 2000). The burden of proof is on the party claiming estoppel. *In re Larson*, 862 F.2d 112, 115 (7th Cir. 1988).

Defendants here have failed to produce adequate support for any of the required elements. They claim that equitable estoppel precludes Singer from proceeding with this *qui tam*

action after Progressive paid a settlement in the *Bianco* Suit for his benefit—a settlement that Defendants claim was paid because "Singer proclaimed in a Bianco judicial document that 'Bianco is wrong on both the facts and the law.'" (Mot. to Dismiss at 15, Dkt. No. 42.) But Defendants submit no proof that Singer himself made any misrepresentations on which the relevant statement was based. Further, Defendants offer no proof that they reasonably relied on any such misrepresentation. Accordingly, at this early stage in the litigation, Defendants have not met their burden of demonstrating that equitable estoppel should bar any of Singer's claims.

### B. Judicial Estoppel

The doctrine of judicial estoppel provides that "a party who prevails in the first case by asserting some proposition may not seek to prevail in a later case by asserting its opposite." *Kale v. Obuchowski*, 985 F.2d 360, 361 (7th Cir. 1993). There is no list of "inflexible prerequisites or an inflexible formula for determining the applicability of judicial estoppel." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). The Seventh Circuit, however, has indicated that a party may be judicially estopped when: (1) its later position is clearly inconsistent with its earlier position; (2) the party to be estopped convinced the first court to adopt its position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *In re Knight-Celotex, LLC*, 695 F.3d 714, 721-22 (7th Cir. 2012).

Here, the first requirement for judicial estoppel appears to be present with respect to Singer's PET claims. Singer, contrary to his current theory in the instant case, took the position in the *Bianco* Suit that not having doctors at the PET scans was not illegal and that Defendants did not falsify documents to make it appear that they were present for PET scans. At this stage of the litigation, however, Defendants have not established the second element of judicial estoppel.

19

Although the *Bianco* suit was resolved when Singer and Defendants paid Bianco a settlement, Singer still may be considered a successful party for the purposes of judicial estoppel. *Kale*, 985 F.2d at 362; *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004). But estoppel only occurs when the inconsistent position was material to the prior adjudication or settlement, *see id.*, and Defendants have not established that to have been the case in the *Bianco* Suit. That case involved 22 claims for relief, only two of which concerned PET scans. Likewise, with respect to the mediation statement, only one half of a page out of an 18-page document concerned PET scans. Accordingly, the relevant portion of the mediation statement cannot be found, on the record currently before the Court, to have been "a basis for or important to the settlement." *Remus v. Sheahan,* No. 05 C 1495, 2006 WL 418654, at *11 (N.D. Ill. Feb. 16, 2006).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. The FCA claims in the Amended Complaint are dismissed without prejudice for failure to state a claim. Without the federal claims, the Court declines to exercise supplemental jurisdiction over the state law claim. Singer is granted leave to file a second amended complaint that attempts to remedy the deficiencies discussed herein by September 29, 2016.

ENTERED:

Dated: August 11, 2016

Andrea R. Wood
United States District Judge